UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LDM GROUP, LLC,                           )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )        Case No. 4:12-CV-812-JAR
                                          )
REX AKERS and BROOKE AKERS,               )
                                          )
            Defendants.                   )

**MEMORANDUM AND ORDER**

This matter is before the Court on the following motions: Defendant Rex Akers's Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 28]; Defendant Brooke Akers's Motion to Dismiss for Lack of Personal Jurisdiction [ECF No. 29]; Defendants' Motion to Dismiss, or Alternatively, to Stay Proceedings and Motion to Compel Arbitration [ECF No. 30]; Plaintiff LDM Group LLC's Motion to Compel Production of Documents [ECF No. 39]; and Plaintiff LDM Group LLC's Motion to Unseal Briefs and Documents. [ECF No. 57] The motions are fully briefed and oral argument was held on November 1, 2012. On December 4, 2012, Defendants filed a transcript redaction request relating "only to confidential information designated as such pursuant to the Court's Protective Order." [ECF No. 80]

**Background**[1]

Plaintiff LDM Group, LLC ("LDM"), is a limited liability company organized under and governed by the laws of Missouri. (First Amended Complaint ("FAC"), Doc. No. 6, ¶ 1)

---

[1]Factual background is taken from LDM's first amended complaint, which the Court accepts as true for purposes of these motions.

1

Defendant Rex Akers is a former Director, President and owner of FDS, Inc. ("FDS"), a Delaware corporation with its principal place of business in Texas.[2] (Id., ¶ 9) His wife, Defendant Brooke Akers, is a former Director, Vice President and owner of FDS. (Id., ¶ 10) The Akers are both Texas residents. This action arises out of a contract between LDM and FDS.

FDS' primary businesses are pharmacy management computer systems and data processing. FDS developed a patented process for a printed product containing information for the patient that is produced at a pharmacy when a prescription is being filled. LDM sought to collaborate with FDS to offer the patented process as a means by which pharmaceutical manufacturers could market their products to patients as well as obtain other data to assist in developing marketing strategies. To that end, LDM and FDS entered into a Retail Provider Point-of-Sale Agreement (the "Contract") in February 2005. (Id., ¶ 11) The Contract was negotiated individually by Rex Akers on behalf of FDS. (Id.) The Contract was extended by several renewals, all of which were signed by Rex Akers on behalf of FDS. (Id.) The LDM-FDS relationship terminated on February 9, 2012. (Id.)

As part of the Contract, FDS agreed to supply certain "data points" of particularized information to LDM. (Id., ¶ 12) LDM would then conduct analyses using test and control groups and invoice pharmaceutical manufacturers for store and print count information. (Id.) LDM agreed to share the revenue collected with FDS. (Id., ¶ 15)

In October 2007, FDS assigned the Contract to FDS Specialty Services, LP ("FDSSS"), a

_____

[2]LDM alleges FDS is currently owned by third parties Lagniappe Health Acquisition Company ("Lagniappe") and Clavert Street Capital Partners. (FAC, ¶ 4)

Texas limited partnership. Rex Akers was the Manager and President of FDS Specialty Services GP, LLC, a Texas limited liability company and general partner of FDSSS.[3]

LDM alleges that during the 2011 calendar year, Rex Akers engaged in or ratified material misrepresentations, omissions and misleading statements relating to, *inter alia*, the quality or quantity of the data provided to LDM, which LDM relied on to its detriment. (Id., ¶¶ 23-25, 28, 32) LDM further alleges that assets are believed to have been illegally removed from FDS as part of a transaction between the Akers and a third party (Lagniappe Health Acquisition Company, Inc.) on or about August 25, 2011, for a substantial price that was inflated by material misrepresentations and/or omissions about FDS's future earnings prospects. (Id., ¶ 50) LDM alleges the Akers have been unjustly enriched by this transaction to the detriment of FDS's creditors, including LDM, and that the transfer of funds was in violation of the Missouri Uniform Fraudulent Transfers Act. (Id., ¶¶ 51-53, 55-57)

On May 7, 2012, LDM filed this action asserting claims against Rex Akers for fraud, negligent misrepresentation, violation of Missouri's Uniform Fraudulent Transfer Act, Mo. Rev. Stat. §§ 428.005, et seq., and unjust enrichment.

On May 10, 2012, LDM filed an arbitration demand against FDS in Texas. In its demand, LDM describes the nature of its dispute with FDS as "breach of contract for failure to deliver required information to patients in accordance with contractual obligations." (Doc. No. 30-3) The Akers filed an arbitration demand against LDM in Texas on May 18, 2012, seeking resolution of LDM's claims. (Doc. No. 30-4)

On May 31, 2012, LDM filed its First Amended Complaint adding Brooke Akers as a

---

[3] FDS and FDSSS are referred to collectively as "FDS."

party defendant and asserting claims for fraudulent transfer and unjust enrichment as to her. (Doc. No. 6)

The Akers have moved to dismiss for lack of personal jurisdiction and to dismiss or in the alternative stay these proceedings and compel arbitration in Texas.

## I. Defendants' Motions to Dismiss for Lack of Personal Jurisdiction

When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists. Velez v. Portfolio Recovery Assoc., Inc., 2012 WL 3038535, at *2-3 (E.D. Mo. July 25, 2002) (citing KV Pharmaceutical Co. v. J. Uriach & CIA, S.A, 648 F.3d 588, 591–92 (8th Cir.2011)). See also, Viasystems, Inc. v. EBM–Pabst St Georgen GMBH & Co., KG, 646 F.3d 589, 592 (8th Cir.2011). To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff is only required to make a prima facie showing of personal jurisdiction over the defendant. KV Pharmaceutical, 648 F.3d at 591. If the district court relies on pleadings and affidavits, the court must look at the facts in the light most favorable to the party invoking personal jurisdiction and resolve all factual conflicts in favor of that party. Anheuser-Busch, Inc. v. City Merch., 176 F.Supp.2d 951, 955 (E.D. Mo. 2001) (internal citations omitted).

In analyzing a motion to dismiss for lack of personal jurisdiction, the Court conducts a two-step inquiry to determine whether it may exercise jurisdiction over a non-resident defendant. First, the Court must determine whether the defendant committed one of the acts enumerated in the state long-arm statute. TLC Vision (USA) Corp. v. Freeman, 2013 WL 230254, at *6 (E.D. Mo. Jan. 22, 2013) (internal citations omitted.) If so, then the Court must determine whether the defendant has sufficient minimum contacts with the state to satisfy the requirements of due process. Id.

## A. Missouri's Long Arm Statute

With these standards in mind, the Court first determines whether the Akers' actions fall within the purview of Missouri's long arm statute. The statute authorizes jurisdiction over defendants that transact business, make a contract, or commit a tort within the state. Mo.Rev.Stat. § 506.500.1. Missouri courts have interpreted the long-arm statute broadly to include "extraterritorial acts that produce consequences in the state." See Bryant v. Smith Interior Design Group, Inc., 310 S.W.3d 227, 232 (Mo. 2010). Extraterritorial acts of negligence and fraud "are subsumed under the tortious act section of the long-arm statute." Id. (citing Longshore v. Norville, 93 S.W.3d 746, 752 (Mo.Ct.App. 2002); Schwartz & Assocs. v. Elite Line, Inc., 751 F.Supp. 1366, 1369 (E.D. Mo. 1990). The Eighth Circuit has adopted a foreseeability standard to be applied when evaluating whether jurisdiction is appropriate over a tortious act occurring in another state with actionable consequences in Missouri. Myers v. Casino Queen, Inc., 689 F.3d 904, 911 (8th Cir. 2012). If a defendant can reasonably foresee his or her negligent actions having consequences felt in Missouri, jurisdiction is authorized. Id.

LDM maintains that the Akers directed FDS employees to submit false information to LDM in Missouri. (Doc. No. 56, pp. 6-15) LDM relies on the deposition testimony of Michael McManus, Executive Vice-President of FDS, who testified that Rex Akers not only knew about the fraud, but also directed and approved the fraudulent scheme aimed at LDM. McManus testified about multiple conversations between himself and Rex Akers in which Rex Akers acknowledged that the data being given to LDM Group was falsified. (Deposition of Michael McManus, Exhibit G ("McManus Depo."), Doc. No. 56-9, at 59:5-59:11) McManus' testimony establishes that Rex Akers was directing Brian Hudson, Vice President of IT and Development

for FDS, to falsify the data being sent to LDM Group:

> Q. All right. So -- and FDS was doing that; they were submitting false data about things that they didn't do, for money, to LDM, right?
> A. Yes.
> Q. And Rex Akers knew about that?
> MR. Warren: Objection, form.
> Q. Right?
> MR. Warren: Objection, form.
> A. Yes.
> Q. And he [Rex] directed that to occur?
> MR. WARREN: Objection, form.
> A. Yes.
> Q. Right? And he [Rex] directed Brian [Hudson] to do it?
> A. Yes.
> Q. And -- but you were there and witnessed it?
> A. Yes.

(Id., at 31:9-32:7)

> Q. But you -- but you knew, from [the] email that Brian [Hudson] had sent you, that FDS was manipulating and adding prints to make them look higher than they were, right?
> A. Yes.
> Q. And you knew they weren't true and accurate print counts, right?
> A. Yes.
> Q. And Rex Akers knew that as well?
> MR. Warren: Objection, form.
> A. Yes.
> Q. And Rex Akers directed Brian Hudson to do that?
> A. Yes.

(Id., at 51:23-52:11)

In particular, McManus testified he was present during one conversation in which he personally witnessed Akers direct Hudson to falsify the data to be given LDM. (Id., at 31:9-32:7; 43:12-43:17; Doc. No. 56-10, at 124:5-124:11) Akers directed Hudson to give LDM Group what it "want[ed]" (McManus Depo, Doc. No. 56-10, at 177:4-177:11), and went on to instruct Hudson to "make sure you have data to back it up." (Id.). LDM contends these instructions

referred to false representations made about the number of stores in which the Akers' companies operated. It was repeatedly falsely reported to LDM Group that there were over 2,100 stores in the FDS network, inflating the number of stores by more than 1,000. (See Deposition of Brian Hudson, Exhibit I ("Hudson Depo."), Doc. No. 56-12, at 18:9-20:20; 28:4-28:7) (Q: "[S]o at least at one point, there's over 2100 stores that were being represented [by] FDS [to LDM] that were being operated when there was less than 1100? A. Yes.").

LDM also relies on the deposition testimony of Peter Fianu, Lagniappe's Chief Information Officer, who testified about his internal investigation into discrepancies relating to the data provided to LDM and his conclusion that Rex Akers knew about the fraudulent scheme and intentionally directed falsified data to LDM. (Deposition of Peter Fianu, Ex. C ("Fianu Depo."), Doc. No. 56-5, at 219:5-221:14; Doc. No. 56-4, at 20:3-20:9; 26:16-27:8; 28:2-29:2; 43:6-43:18; 30:24-33:10;77:12-77:17) It was Fianu's testimony that Hudson confessed he had been manipulating the data, but that "Mike [McManus] and Rex told us to do it." (Id. at 82:3-83:3) (emphasis added). From the outset, "Brian [Hudson] made it abundantly clear that Rex knew" about the fraudulent scheme. (Id., Doc. No. 56-4, at 82:3-83:3; 87:19-87:22)

LDM states that when a corporate officer engages in tortious conduct in his corporate capacity in the forum, courts consider this conduct contact with the forum sufficient to support a finding of personal jurisdiction. See Ripplemeyerv. National Grape Co-op. Ass'n, Inc., 807 F.Supp. 1439, 1446 (W.D. Ark. 1992); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n. 13 (1984).

The Akers concede that if LDM can prove the Akers' conduct was directed at LDM in Missouri, then this would constitute sufficient contacts with Missouri. (Transcript of Motion

Hearing ("Tr."), Doc. No. 79, 9:12-24) However, they argue the only such evidence comes from one specific incident when McManus was present during a conversation between Rex Akers and Brian Hudson. The rest of McManus' testimony is based on conversations he had with others, and testimony based on hearsay cannot be the basis for jurisdiction. See Garrett v. The Church of the Nazarene, 2005 WL 2219805, at *1 (W.D. Mo. Sept. 12, 2005).

The Court notes that its November 1, 2012 hearing on the Akers' motions to dismiss was a generalized hearing on the issue of personal jurisdiction. It was not a "full-blown evidentiary hearing." TLC Vision, 2013 WL 230254, at *6. The parties presented only argument - not evidence - at the hearing. See Dakota Industries, Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991) ("Jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing."). Furthermore, "[a] single tortious act is sufficient to support personal jurisdiction consistent with due process standards." Nelson v. R. Greenspan & Co., 613 F. Supp. 342, 346 (E.D. Mo. 1985) (citing Institutional Marketing Associates, Ltd. v. Golden State Strawberries, Inc., 587 F.Supp. 1105 (E.D. Mo. 1983)).

Clearly it would be foreseeable to the Akers that the scope of their alleged actions would be felt in Missouri particularly because they knew LDM was a Missouri company. (See, Doc. No. 56, p. 18 - (Ex. I, Hudson Dep. at 194:12-194:15; Ex. B, R. Akers Dep. at 47:20-47:23; Ex. J, Ward Dep. at 30:9-30:16). Thus, the Court finds the record satisfies the third category under Missouri's long-arm statute of "commit[ing] a tortious act within this state."

**B. Due Process**

Having found that jurisdiction is proper under the long-arm statute, the Court must next determine whether the exercise of such jurisdiction comports with due process. TLC Vision,

2013 WL 230254, at *6. To satisfy due process, a defendant must have sufficient minimum contacts with the forum State "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The second stage of the due process inquiry addresses whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice," that is, whether it is reasonable under the circumstances of the particular case. International Shoe Company v. Washington, 326 U.S. 310, 316 (1945).

Based on these principles, the Eighth Circuit applies a five-factor test in determining whether sufficient minimum contacts exist for personal jurisdiction: "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." In making a personal jurisdiction determination, the Court looks at all of the factors as a whole and examines the totality of the circumstances. See Johnson v. Arden, 614 F.3d 785, 794 (8th Cir. 2010) (citing Northrop King Co. v. Companie Productora Semillas Algodoneras, S.A., 51 F.3d 1383, 1388 (8th Cir. 1995). In addition, under the "effects" test set out in Calder v. Jones, 465 U.S. 783 (1984), personal jurisdiction can be asserted over non-resident defendants whose acts "are performed for the very purpose of having their consequences felt in the forum state." Dakota Indus., 946 F.2d at 1390-91. The "effects" test does not replace the five factor test; however, it is a way to evaluate at least the first three

factors. <u>Estate of Witko v. Hornell Brewing Co.</u>, 156 F.Supp.2d 1092, 1101 (D.S.D. 2001).

In support of their motions to dismiss, the Akers submit sworn declarations stating their personal contacts with Missouri are minimal. They state they have rarely been to Missouri, own no property or assets in Missouri, conduct no business in Missouri, and have never traveled to Missouri in their capacities as representatives of FDS. (Declaration of William Rex Akers, Doc. No. 28-2; Declaration of Brooke Akers, Doc. No. 29-5 ) The Akers further state they have never made any communications, via telephone or otherwise, to anyone associated with LDM in Missouri.

LDM responds with numerous examples of the Akers' repeated contacts with the State of Missouri. (Memorandum in Opposition, Doc. No. 56, pp. 17-20) In particular, the Akers' companies had business relationships with "at least" 100 Missouri pharmacies (<u>Id</u>., p. 18 citing (Deposition of Rex Akers, Ex. B ("R. Akers Depo."), Doc. No. 56-2, at 50:25-51:6; <u>see also</u> <u>id</u>. at 28:10-28:15; 47:24-48:4), including pharmacies that provided services on behalf of FDS. (<u>Id</u>., citing Deposition of Brooke Akers, Ex. L ("B. Akers Depo."), Doc. No. 56-15, at 28:5-28:12) In addition, the Akers, through their companies, operated software on pharmacy platforms in Missouri. (<u>Id</u>.) Another Akers company, HCC, which is essentially the "same outfit" as FDS, (<u>Id</u>., citing Hudson Depo., at 5:7-5:11), is registered to do business with the Missouri Secretary of State and has registered a fictitious name in the State of Missouri. (<u>Id</u>.; Deposition of Tracy Lynn Ward, Ex. J ("Ward Depo."), Doc. No. 56-13, at 55:2-56:3) The Akers have made phone calls into Missouri for business (<u>Id</u>., citing R. Akers Depo., Doc. No. 56-3, at 107:15-107:17; Ex. E, LDM Group Dep. at 19:20-19:23; Ex. L, B. Akers Depo., Doc. No. 56-3, at 41:16-41:23) and traveled to Missouri for personal trips within the last two or three years. (<u>Id</u>., citing R. Akers

Depo., Doc. No. 56-3, at 106:1-106:6; B. Akers Depo., Doc. No. 56-3, at 25:24-26:8).

In light of this record, and resolving all doubts in LDM's favor, the Court finds and concludes that LDM has made a prima facie showing of personal jurisdiction over the Akers based on their extraterritorial conduct combined with their contacts within Missouri sufficient to survive the present motions to dismiss for lack of personal jurisdiction. "Jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." See Dakota Indus., Inc., 946 F.2d at 1387. The Akers' motions to dismiss for lack of personal jurisdiction will be denied.

**II. Defendants' Motion to Dismiss or in the Alternative to Stay and Compel Arbitration**

In support of their motion, the Akers state the Contract contains an express arbitration provision requiring the parties to arbitrate this dispute in Texas. (As discussed above, there are two pending arbitrations instituted before the American Arbitration Association in Texas.) The arbitration provision provides in pertinent part as follows:

> Any and all controversies or claims between the parties arising out of or related to this Agreement, or any alleged breach thereof, shall be settled and resolved exclusively by binding arbitration in accordance with the Rules of the American Arbitration Association ("AAA") and judgment upon any award(s) entered by the Arbitrator(s) may be entered in any court having jurisdiction thereof . . .

> The arbitration proceedings shall be conducted at Fort Worth, Texas. The laws of the State of Texas shall apply in resolving the dispute . . .

(Doc. No. 30-1, ¶11 (a); (c)) The issue for the Court's determination is whether the Akers, as non-signatories, can enforce the arbitration provision against LDM, a signatory to the Contract. While the parties agree that state contract law governs the ability of non-signatories to enforce arbitration provisions, see Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009), they

11

disagree on which state's law applies, Texas or Missouri.

The Akers argue that Texas law should apply based on the choice-of-law provision in the Contract (Doc. No. 30-1, ¶ 12(l)), and that under Texas law, the agents of a signatory may invoke an arbitration clause even if they themselves are non-signatories if the agent's liability arises from and must be determined by reference to the parties' contract rather than general obligations imposed by law." See In re H&R Block Fin. Advisors, Inc., 235 S.W.3d 177, 178 (Tex. 2007); In re Kaplan Higher Education Corp., 235 S.W.3d 206, 209 (Tex. 2007); In re Vesta Ins. Grp., Inc., 192 S.W.3d 759, 762 (Tex. 2006). (Id., p. 14) The Akers contend that LDM cannot state a cause of action against them without relying upon or referencing the Contract and the resulting commercial relationship between LDM and FDS. Therefore, LDM's claims are within the scope of the arbitration provision. (Doc. No. 30, pp. 7-9)

In response, LDM argues that as non-parties to the Contract, the Akers cannot invoke the Contract's choice-of-law provision, let alone arbitration, particularly in light of the Contract's express prohibition of extending any contractual rights, interests or terms to non-parties. (Doc. No. 55, pp. 4-6) LDM states that under Missouri law, non-parties cannot compel arbitration simply because they are agents of the signatory where, as here, the plaintiff has only asserted tort claims against the agents in their individual capacities, citing Jones v. Paradies, 380 S.W.3d 13 (Mo.Ct.App. 2012) and Springfield Iron & Metal, LLC v. Westfall, 349 S.W. 3d 487 (Mo.Ct.App. 2011). (Doc. No. 55, pp. 10-12) Furthermore, under Missouri choice-of-law principles, Missouri law applies where there is a threshold question concerning the validity of the contract itself, citing Rosemann v. Sigillito, 877 F.Supp.2d 763, 768 (E.D. Mo. 2012). (Doc. No. 55, pp. 6-9) It does not appear to the Court, however, that either party is challenging the

validity of the Contract. Indeed, LDM has initiated arbitration in Texas based on the Contract.

The Akers reply that contract clauses limiting application to "the parties" of the agreement may still bind a non-signatory to arbitration "where traditional principles of contract and agency law would treat a non-signatory as a party to the contract." Petersen v. EMC Telecom Corp., 2010 WL 2490002, at * 3 (D. Ariz. 2010) (and cases cited therein). See also Meyer v. WMCO-GP, LLC, 211 S.W.3d 302, 306 (Tex. 2006). (Doc. No. 68, pp. 9-10).

As a threshold matter, Missouri courts generally give effect to contractual choice-of- law clauses as long as the application of the law is not contrary to a fundamental policy of Missouri. Davidson & Associates, Inc. v. Internet Gateway, Inc., 334 F.Supp.2d 1164, 1175-76 (E.D.Mo. 2004) (citing Peoples Bank v. Carter, 132 S.W.3d 302, 304 (Mo.Ct.App.2004)). In Donaldson Co., Inc. v. Burroughs Diesel, Inc., 581 F.3d 726, 732 (8th Cir. 2009), the Eighth Circuit applied Mississippi law based on a choice of law provision to decide whether a non-signatory could enforce an arbitration provision against a signatory. Id. at 732.

When a contract contains a choice of law provision, the validity of that provision is governed by § 187 of the Restatement (Second) of Conflict of Laws (1971), which provides in part that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Davidson, 334 F.Supp.2d at 1175-76. Because the issue involved here is one in which the parties could have resolved by mutual agreement, i.e., which law governs interpretation of the Contract, the Court will apply Texas law. However, even if Missouri law is applied, this Court has recognized that a nonsignatory can enforce an arbitration clause against a signatory to the agreement in certain circumstances. See,

SRS Energy, Inc. v. Bio-Products Intern., Inc., 2008 WL 2224803, at *5 (E.D. Mo. May 27, 2008) ("When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.")

As discussed above, under Texas law, the agents of a signatory may invoke an arbitration clause even if they themselves are non-signatories if the agent's liability arises from and must be determined by reference to the parties' contract rather than general obligations imposed by law." In re H&R Block, 235 S.W.3d at 178; In re Kaplan, 235 S.W.3d at 209; In re Vesta, 192 S.W.3d at 762. These cases stands for the proposition that a signatory plaintiff cannot avoid arbitration simply by bringing tortious interference claims against the officers, agents or affiliates of the other signatory to the contract. "If a plaintiff's choice between suing the corporation or suing the employees determines whether an arbitration agreement is binding, then such agreements are rendered illusory on one side." In re Merrill Lynch, 235 S.W.3d at 189. Furthermore, when parties agree to arbitrate all disputes "under or with respect to" a contract, they generally intend to include disputes about their agents' actions as well. In re Vesta, 192 S.W.3d at 762; In re Merrill Lynch Trust Co., 235 S.W.3d 185, 188 (Tex. 2007).

In ruling on a motion to stay and compel arbitration, the Court must determine whether the particular claims at issue are subject to the agreement. SRS Energy, 2008 WL 2224803, at *5 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985). Federal law applies to determine the scope of an arbitration clause. Donaldson, 581 F.3d at 731-32. In making this determination, the Court is mindful of the strong federal policy in favor of arbitration, Chisolm v. Career Educ. Corp., 2011 WL 5524552, at *1 (E.D. Mo. Nov. 14, 2011),

and notes that the scope of an arbitration agreement is to be liberally construed, with "any doubts resolved in favor of arbitration." MedCam, Inc. v. MCNC, 414 F.3d 972, 974 (8th Cir. 2005). Broadly worded arbitration clauses such as the one at issue here are generally construed to cover tort suits arising from the same set of operative facts covered by a contract between the parties to the agreement. See CD Partners, LLC v. Grizzle, 424 F.3d 795, 800-01 (8th Cir. 2005) (and cases cited therein).

The Akers maintain that LDM's claims "arise out of" or "relate to" the Contract. As set out in the first amended complaint, LDM's allegations are clearly premised on the FDS-LDM Contract's reporting and payment obligations:

> Under the contract and renewals and representations, among other things, Rex Akers promised that his company would supply LDM with data points of particularized information. (FAC, ¶ 12)
>
> Rex Akers knew of and represented that he understood at the time the contract was entered into, and upon each renewal, that accuracy in the data points was a necessary prerequisite to payments. (Id., ¶ 17)
>
> Rex Akers represented in the contract and renewal negotiations that LDM would be provided with accurate data points at all times and records would be available to substantiate the accuracy of data points upon any request by a third party client. (Id., ¶ 18)
>
> It has recently come to light that the representations made by Defendant Rex Akers as to FDS's ability and intent to provide accurate data points were false in that Defendant Rex Akers knew or should have known that FDS did not implement programs and did not report data in conformity with LDM Group's required specifications. (Id., ¶ 23)

(Doc. No. 68, pp. 12-13)

In response, LDM argues its claims against the Akers are not simply contract claims recast as tort claims. (Doc. No. 55, p. 2) Rather, LDM alleges that Rex Akers committed fraud and that both he and Brooke Akers took actions to move the money from that fraud out of

LDM's reach to their unjust enrichment. (FAC, ¶¶ 24-32, 34) LDM has not alleged that the Akers breached any contractual obligations or particular terms under the Contract. (Doc. No. 55, p. 12) However, the Eighth Circuit has held that in determining the scope of the arbitration provision, it generally does not matter that claims sound in tort rather than in contract. PRM Energy Systems, Inc. v. Primenergy, L.L.C., 592 F.3d 830, 832 (citing Hudson v. ConAgra Poultry Co., 484 F.3d 496, 499-500 (8th Cir. 2007) ("Under the [FAA], we generally construe broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship, and we compel arbitration of such claims.")); 3M Co. v. Amtex Sec., Inc., 542 F.3d 1193, 1199 (8th Cir. 2008) (Arbitration may be compelled under a broad arbitration clause as long as the underlying factual allegations "simply touch matters covered by the arbitration provision."). See also, SRS Energy, 2008 WL 2224803, at *6 ("Arbitration must be compelled where a tort claim arises directly out of a dispute regarding the terms of the parties [sic] contractual relation, or where the statements giving rise to a tort claim are integrally linked to the contractual relation between the parties.") (internal quotations omitted)..

Under this standard, the Court finds LDM's claims arise from the FDS-LDM Contract and resulting commercial relationship between the parties and, are therefore, arbitrable. Where a plaintiff's claims are arbitrable, the typical remedy contemplated by the FAA is to stay the instant action. See 9 U.S.C. § 3. LDM cannot be heard to oppose the stay and arbitration since it initiated arbitration in Texas based on the Contract. Thus, the Court will grant the motion to compel arbitration and stay this matter pending resolution of the arbitration proceedings in Texas. Whether these arbitrations may proceed on a consolidated basis is a question for the arbitrator to decide. See, Medicine Shoppe Intern., Inc. v. Bill's Pills, Inc., 2012 WL 1660958, at

\* 4 (E.D. Mo. May 11, 2012).

**III**. **Plaintiff's Motion to Compel Production of Documents**

The Court permitted the parties to conduct expedited discovery on the limited issue of personal jurisdiction. (Doc. No. 24) As part of that jurisdictional discovery, LDM deposed three Lagniappe employees, Michael McManus, Brian Hudson, and Tracy Ward, and a corporate representative, Peter Fianu. LDM also served the Akers with eleven requests for documents concerning LDM and Lagniappe (RFP No. 10), communications between LDM and Lagniappe (RFP No. 9), payments made to and received from LDM (RFP No. 11), as well as documents relating to the Akers' actions in transferring funds among various corporate entities including Lagniappe (RFP Nos. 1-8), and the corporate structure of those entities. (RFP Nos. 7, 8).

The Akers object to LDM's document requests as overly broad requests directed at the merits of LDM's claims and premature in light of their pending motions. (Doc. No. 40) In response, LDM maintains the requested documents are all relevant to whether the Akers had minimum "contacts" with LDM in Missouri or otherwise directed communications or information to LDM within Missouri and whether they engaged in intentional or tortious conduct with the purpose of having the conduct felt by LDM in Missouri. (Doc. No. 41, pp. 3-4)

After reviewing the parties' briefing, it appears to the Court that while the parties have conducted some discovery, there are still certain documents LDM is seeking from Lagniappe which are in the possession, custody and control of the Akers, specifically, four "witness statements" and two "draft expert" reports prepared by an accounting firm and a computer forensic firm, that are being withheld from LDM. (Doc. No. 71, p. 9 n.6) Under Rule 26(b)(1), Fed.R.Civ.P., parties may obtain discovery "regarding any matter, not privileged, that is relevant

to the claim or defense of any party." Relevancy is broadly construed, and "a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." American Builders & Contractors Supply Co., Inc. v. Roofers Mart, Inc., 2011 WL 5178154, at *1 (E.D.Mo. Nov. 1, 2011) (citation omitted). Because the Court finds these documents may be relevant to show the details of the Akers' alleged fraudulent scheme and the financial impact of the scheme on LDM in Missouri, (Doc. No. 56-8), the Court will grant LDM's motion to compel as to these particular documents.

### IV. Plaintiff's Motion to Unseal Briefs and Documents

The Court has supervisory power over its papers and files, and the decision to seal or unseal a court document is left to the exercise of the Court's discretion given the relevant facts and circumstances of the particular case. Monsanto Co. v. E.I. DuPont De Nemours and Co., 2012 WL 5830580, *2 (E.D.Mo.Nov. 16, 2012) (citing Nixon v. Warner Communications, 435 U.S. 589, 598-99 (1978)). However, "only the most compelling reasons can justify non-disclosure of judicial records." Id. (quoting In re Neal, 461 F.3d 1048, 1053 (8th Cir.2006)). The presumption in favor of access places the burden on the party seeking to maintain confidentiality to establish sufficient grounds for prohibiting public access to the record. See Rohrbough v. Hall, 2010 WL 1998554 at *1 (E.D.Mo. May 19, 2010).

By way of background, on September 18, 2012, the Akers filed a supplement to their motions to dismiss and attached excerpts of deposition transcripts of Lagniappe employees with the Court without any confidentiality designation. (Doc. No. 49)[4] On September 26, 2012,

---

[4]Lagniappe is not a party to this litigation. The Court granted Lagniappe leave to intervene for the limited purpose of opposing LDM's motion to unseal briefs and documents. (Doc. No. 63)

Lagniappe notified LDM it was designating the transcripts in their entirety as confidential information pursuant to the Court's Protective Order entered on August 2, 2012. (Doc. No. 45). The Protective Order allows a party or non-party to designate "appropriate portions" of deposition testimony as "confidential." (Doc. No. 45, ¶ 2) The Protective Order applies only to privileged information, and "trade secrets, confidential commercial information, or other proprietary information." (Id., ¶ 1) While taking issue with Lagniappe's confidentiality designations, LDM consented to filing its memorandum in opposition to the Akers' motions to dismiss, which cites extensively to the deposition testimony, under seal pending review. (Doc. No. 53)

In support of its motion, LDM contends that Lagniappe's designations are inappropriate first, because it has not designated "appropriate portions" of the testimony as confidential, and second, because neither Lagniappe nor the Akers can meet their burden to establish the testimony reveals any "trade secrets," "confidential commercial information," or "proprietary information" as those terms are commonly understood.[5] (Doc. No. 57, p. 5)

In response, Lagniappe contends that disclosure of the testimony and documents in this case creates a substantial threat to its current and future competitive and financial position because there is a risk that it would be unfairly associated with the misconduct of FDS

---

[5]LDM refers to the definition of "trade secrets" in the Uniform Trade Secrets Act, § 1(4), to-wit, "information, including a formula, pattern, compilation, program device, method, technique, or process, that: (i) derives independent economic value, actual or potential, form not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." "Proprietary information" is defined as "information in which the owner has a protectable interest." Black's Law Dictionary, 8th Ed.) LDM looks to the Freedom of Information Act Regulations, 5 CFR 294.112(b)(1) for the definition of "confidential commercial information" as information which "could reasonably be expected to cause substantial competitive harm." (Doc. No. 57, pp. 4-5)

employees prior to Lagniappe's ownership. (Doc. No. 72, p. 7) The Akers argue the motion should be denied because it seeks relief that would not be available to LDM had it pursued its claims against them in arbitration. (Doc. No. 73, p. 2)

The Court has carefully reviewed the deposition transcripts and finds the testimony, consisting of background information about the Lagniappe employees, their relationship and interactions with LDM and the alleged fraudulent information directed at LDM, does not disclose any "trade secrets" or proprietary information within the purview of the Court's protective order. Furthermore, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." SEC v. Shanahan, 2006 WL 3330972, at *4 (E.D. Mo. Nov. 15, 2006). In light of the presumption in favor of public access to judicial records, and because Lagniappe has not demonstrated that public disclosure would result in competitive or financial harm, LDM's motion to unseal briefs and records will be granted.

In addition, the Akers propose redactions be made to the transcript of the November 1, 2012 hearing relating to "confidential information designated as such" pursuant to the Court's Protective Order Regarding Confidentiality dated August 2, 2012. (Doc. No. 80) Lagniappe joins in Defendants' requested redactions. (Doc. No. 81) Again, a review of the testimony sought to be redacted concerns the alleged fraudulent conduct directed at LDM and not "trade secrets, confidential information, or other proprietary information." For the reasons discussed above, the request for redactions will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that  Defendant Rex Akers's Motion to Dismiss for Lack

of Personal Jurisdiction [28] and Defendant Brooke Akers's Motion to Dismiss for Lack of Personal Jurisdiction [29] are **DENIED**.

      **IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss, or Alternatively, to Stay Proceedings and Motion to Compel Arbitration [30] is **GRANTED** and this matter is stayed pending resolution of the arbitration proceedings in Texas.

      **IT IS FURTHER ORDERED** that Plaintiff LDM Group LLC's Motion to Compel Production of Documents [39] is **GRANTED** and Defendants shall produce Lagniappe's four witness statements and two draft expert reports prepared by an accounting firm and a computer forensic firm to LDM within five (5) days of the date of this Order.

      **IT IS FURTHER ORDERED** that Plaintiff LDM Group LLC's Motion to Unseal Briefs and Documents [57] is **GRANTED** and the parties' briefings and attached deposition transcripts (Doc. Nos. 49, 56, 57, 66, 67, 72, 73 and 76) are **UNSEALED**.

      **IT IS FURTHER ORDERED** that Defendants' request for redactions of the transcript of the November 1, 2012 hearing is **DENIED**.

      **IT IS FURTHER ORDERED** that counsel shall jointly submit a notice updating the Court on the status of this case every ninety (90) days or no later than ten (10) days following the resolution of the arbitration proceedings in Texas.

Dated this 29th day of March, 2013.

                                    JOHN A. ROSS
                                    UNITED STATES DISTRICT JUDGE